# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **8:06CR85** |
| vs. | ) | |
| | ) | **REPORT AND** |
| LUIS MACEDO, | ) | **RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

This case is before the court on the MOTION TO SUPPRESS EVIDENCE [9] filed by defendant, Luis Macedo. An evidentiary hearing was held on May 23, 2006. The transcript [18] was filed on June 9, 2006, at which time the motion was deemed submitted.

Macedo moves the court for the suppression of all evidence obtained during the March 1, 2006 search of his vehicle.[1] Macedo alleges that law enforcement lacked probable cause to search his vehicle and that his consent to search was not voluntary and thus violated his Fourth Amendment rights under the United States Constitution.

## FACTUAL BACKGROUND

Trooper Dean Riedel testified that on March 1, 2006, while traveling eastbound on I-80, he observed a gold SUV, also eastbound on I-80, which he believed was following another vehicle too closely (4:17-5:12). Riedel also observed the vehicle make two improper lane changes in that the driver failed to signal before changing lanes.

---

[1]During the hearing on the motion, Macedo withdrew his claim that the stop of his vehicle was without probable cause (43:5-11).

Riedel testified that after stopping the SUV, he made contact with the driver (9:9-17).[2]
He advised the driver of the reasons for the stop and requested the driver's vehicle
information and driver's license.  The driver identified himself by a Wisconsin operator's
license as Luis Macedo (10:15-22).  Macedo advised the vehicle was rented and began
searching for the rental agreement in several locations, including the passenger compartment
and in the hatchback (10:24-12:2).  After Macedo located the rental agreement, Riedel
requested that Macedo accompany him to his patrol vehicle so paperwork could be
completed (12:21-24).

In the patrol unit, Riedel completed the paperwork, ran Macedo's driver's license and
engaged Macedo in casual conversation (12:25-13).  Riedel learned that Macedo had rented
the vehicle in Los Angeles, where he had family connections, and that most recently he was
coming from Denver, Colorado, where he had visited a friend (13:7-16).

Riedel testified that during the conversation with Macedo he observed Macedo was
overly shaking, spoke pretty rapidly, and explained more than Riedel asked.  Riedel also
observed sweat beads starting to appear on Macedo's forehead, which Riedel felt abnormal
because it was a cool day and the air conditioning in the patrol unit was on (13:20-14:2).

---

[2]Riedel's patrol vehicle had a in-service camera which was activated when he turned on his emergency
lights and remained activated through the search of the vehicle (9:18-24).  A review of the DVD (Ex. 2)
reveals the following: The stop of Macedo's vehicle occurred at 13:25; Macedo located his rental agreement
at 13:29; Macedo's paperwork and a warning ticket were given to him at 13:36; from 13:36 to 13:38 Riedel
asks questions and Macedo responds to questions; Riedel asks for permission to search at 13:38; and Riedel
located drugs in Macedo's vehicle at 13:56.

Macedo informed Riedel that he was in the consumer testing business and that he actually tested products like beer, Coke, and Pepsi.

Riedel was suspicious because he observed the cost of the rental vehicle and felt that the cost of the rental plus the gas involved in the trip would be in excess of a plane ticket (14:24-15:5). Macedo informed him that he was driving to Chicago where he was to turn in the rental vehicle. Riedel, however, felt that Macedo contradicted himself in first saying he was visiting a friend in Denver, and then stating that he was visiting several friends, moving stuff, and was on his way to the Wisconsin Dells because he had family there. He also advised Riedel that he had no more business trips planned, and that he had not done any business on his trip from Los Angeles (15:18-16:7).

After Riedel received word from dispatch that Macedo's driver's license was not suspended and that Macedo had no record or warrants, he handed Macedo his paperwork, along with a warning ticket, and Macedo began to exit the patrol vehicle (16:13-20). Riedel then asked Macedo if he would have time for a couple more quick questions. Macedo responded, "Yes sir," and Riedel proceeded to ask him about the cost differences of the rental agreement compared to an airline ticket, Macedo's stay in Denver, and about illegal substances or objects in the vehicle (17:3-8). Specifically, Riedel asked Macedo if he had any guns, knives, or weapons. Macedo responded, "No." Riedel asked about the presence of currency or cash. Macedo responded that he had about $200. As Riedel asked Macedo about the presence of marijuana, cocaine, methamphetamine or heroin in the vehicle, he

-3-

observed Macedo's carotid artery and observed a carotic pulse in Macedo's neck that he had not seen before, he observed Macedo breaking eye contact with him, and additional beads of sweat on Macedo's forehead which were present although Macedo had wiped them off earlier.   These observations concerned Riedel because as part of his training as an interdiction officer these things are present when an individual is excited or nervous (17:24-18:15).

Riedel testified that he asked Macedo for consent to search his vehicle.  Macedo responded, "go, uh-huh" and  gestured in a manner presenting the vehicle with his arms and shaking his head in a yes manner (18:16-21).  Riedel informed Macedo that he was going to get out of the vehicle and if Macedo needed to talk with him all he had to do was honk the horn and they would converse (19:4-7).  Riedel estimated that it was 14 minutes from the stop until he received the consent to search and he estimated that he searched for 10 minutes before finding a package that contained what he believed was cocaine (21:1-7).[3]  Riedel noted that while he searched the vehicle, Macedo never honked the horn, ask any questions, engaged in any conversation, or requested that he stop the search (21:8-16).

On cross-examination Riedel testified that since 1999 he had between 64 and 80 hours of classes involving drug interdiction (22:7-22).  Riedel characterized Macedo's search for the rental contract as "frantically looking" which he described as unusual when compared to

---

[3]The DVD from Riedel's patrol vehicle shows the time from stop to consent to be 13 minutes (this includes the four minutes during which Macedo searched for the rental agreement for the vehicle).  The DVD shows the time from consent to the location of the cocaine to be 18 minutes.

"normal" people he stops on a daily basis.  He also noted that when Macedo finally found the rental documents it was in a place he had already looked.  Riedel admitted that Macedo never answered "yes" when asked if the vehicle could be searched (36:14-22).

## LEGAL ANALYSIS

### A.  Scope and Duration of the Traffic Stop

Having made a valid traffic stop, an officer is allowed to detain the occupants of the vehicle while completing "a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning." *United States v. $404,905.00 in United States Currency*, 182 F.3d 643, 647 (8th Cir. 1999), *cert. denied*, 528 U.S. 1161 (2000); *see also United States v. Brown*, 345 F.3d 574, 578 (8th Cir. 2003).  "During this process, the officer may ask the motorist routine questions such as his destination, the purpose of the trip, or whether the officer may search the vehicle, and he may act on whatever information is volunteered."  *United States v. $404,905.00*, 182 F.3d at 647; *see also United States v. Fuse*, 391 F.3d 924, 927 (8th Cir. 2004), *cert. denied*, 544 U.S. 990 (2005); *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005); *United States v. White*, 81 F.3d 775, 778 (8th Cir.), *cert. denied*, 519 U.S. 1011 (1996); *United States v. Ramos*, 42 F.3d 1160, 1163 (8th  Cir. 1994), *cert. denied*, 514 U.S. 1134 (1995).

In this case, a review of the DVD shows that these tasks were accomplished in about 11 minutes, at which time Riedel returned all of Macedo's documents and issued a warning

ticket.  Not until then did Riedel ask Macedo if he could ask him a couple more quick questions.  Macedo agreed, at which time Riedel asked him several questions about his trip, whether or not he had contraband in the vehicle, and for permission to search the vehicle. The entire conversation took about two minutes.

I find that the defendant was no longer "seized" within the meaning of the Fourth Amendment after Riedel returned his documents along with the warning ticket, and a reasonable person in defendant's position at the time Riedel asked for further conversation and permission to search would "feel free to terminate the encounter and be on his way." Riedel did not re-seize the defendant by asking if he could talk to him and obtaining permission to do so.  *See United States v. Morgan*, 270 F.3d 625, 630 (8th Cir. 2001), *cert. denied*, 537 U.S. 849 (2002); *United States v. Santos-Garcia*, 313 F.3d 1073, 1078 (8th Cir. 2003). Nothing in the record suggests that Riedel acted in such a way that a reasonable person would believe that he was not free to decline the request for further conversation or terminate the encounter altogether.  *See United States v. Morgan*, 270 F.3d at 630.  Thus, I find that the 11-minute traffic stop was not unlawfully expanded, and that the subsequent contact between Macedo and Riedel was consensual.  *See, e.g., United States v. White*, 81 F.3d at 779 (after defendant's license and registration were returned and the warning was issued, the encounter "became nothing more than a consensual encounter between a private citizen and a law enforcement officer"); *United States v. Santos-Garcia*, 313 F.3d at 1078

-6-

(defendant was no longer seized within the meaning of the Fourth Amendment after officer returned his identification and issued a warning ticket).

**B.  Search of the Vehicle**

Police may conduct a search of someone's vehicle, home or person without a warrant or probable cause if that person voluntarily consents to the search.  *See, e.g., United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000); *United States v. Deanda*, 73 F.3d 825 (8th Cir. 1996).  To determine whether such a consent was voluntary, the court must examine the totality of the circumstances, including the characteristics of the accused and the nature of the encounter.  *See Bradley*, 234 F.3d at 366.

The government has the burden of proving consent was voluntary. *United States v. Parris*, 17 F.3d 227, 229 (8th Cir.), *cert. denied*, 511 U.S. 1077 (1994); *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir.), *cert. denied*, 516 U.S. 892 (1995).  "The prosecution need not prove that the individual was fully aware of his or her rights under the Fourth Amendment in order to establish a voluntary consent."  *Heath*, 58 F.3d at 1275 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 235 (1973)).  "Consent is voluntary 'if it was the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied.'" *United States v. Fleck*, 413 F.3d 883, 891 (8th Cir.2005) (quoting *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990)).

The failure to inform an individual of his or her right to refuse consent, in itself, will not render a consent involuntary.

The Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search. *See, e.g., Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996); *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." *Ibid.* Nor do this Court's decisions suggest that even though there are no per se rules, a presumption of invalidity attaches if a citizen consented without explicit notification that he or she was free to refuse to cooperate. Instead, the Court has repeated that the totality of the circumstances must control, without giving extra weight to the absence of this type of warning. *See, e.g., Schneckloth, supra*; *Robinette, supra*, at 39-40.

*United States v. Drayton*, 536 U.S. 194, 206-207 (2002); *accord United States v. Brown*, 345 F.3d 574, 579 (8th Cir. 2003); *United States v. Santos-Garcia*, 313 F.3d at 1078.

The recorded conversation between Riedel and Macedo generally corroborates the officer's testimony, and the court finds that the defendant verbally consented to the search of his vehicle. The consent was not limited in any fashion, not retracted, and not the result of any threat, promise, or inducement by Riedel. Macedo never honked the horn to get Riedel's attention, did not ask any questions, and did not ask that Riedel stop the search.

Considering the *Chaidez* factors[4] in conjunction with the DVD and the hearing

---

[4]Courts in the Eighth Circuit generally consider the "*Chaidez* factors" to determine if consent was voluntary:

"Characteristics of persons giving consent" which may be relevant to the question include: (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

*Id.* at 381 (internal citations omitted). Characteristics of "the environment in which consent was given" include:

whether the person who consented (1) was detained and questioned for a long or short time;

testimony, I find that the defendant voluntarily consented to the search of his vehicle.

## RECOMMENDATION

For the reasons discussed herein,

**IT IS RECOMMENDED** that Macedo's MOTION TO SUPPRESS EVIDENCE [9] be

denied.

Pursuant to NELR 72.4, any objection to this recommendation may be made by filing a "Statement of Objection to Magistrate Judge's Recommendation" within 10 days after being served with a copy of the recommendation. The statement of objection shall specify those portions of the recommendation to which objection is made and the basis of the objection. The objecting party shall, at the time of filing the objection, file a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made.

**DATED June 26, 2006.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**

---

(2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.

*Id*. (internal citations omitted). The factors should not be applied mechanically, *id*., and no single factor is dispositive or controlling. *United States v. Ponce*, 8 F.3d 989, 997 (5th Cir.1993).

*United States v. Bradley*, 234 F.3d at 366.